ORDERED UNSEALED on 09/11/2026 s/ andreasar

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ABDULRAHMAN AYMAN ALAWAD,<br>Defendant. | Case No.: 26mj5174<br>**COMPLAINT FOR VIOLATION OF**<br>Title 18, U.S.C., Sec. 1343 – Wire Fraud; Title 18, U.S.C., Sec. 1957 – Money Laundering; Title 18, U.S.C., Secs. 981(a)(1)(A), (C), 982(a)(1), (2) and Title 28, U.S.C., Sec. 2461(c) and Title 21, U.S.C., Sec. 853 - Criminal Forfeiture<br>**[UNDER SEAL]**<br>s/ AAS |

The undersigned complainant being duly sworn states:

At all times relevant to this Complaint:

**INTRODUCTION**

1. The United States Department of Health and Human Services ("HHS") provided federal funding to states, including the State of California, to help low-income families pay for childcare expenses.

2. In California, four programs provided subsidies to childcare providers servicing income-eligible families: CalWORKs Stage 1, CalWORKs Stage 2 Alternative Payment ("C2AP"), CalWORKs Stage 3 Alternative Payment ("C3AP"), and California Alternative Payment Program ("CAPP").

3. In the Southern District of California, the County of San Diego administered "Stage 1" subsidies, and two community organizations,

Child Development Associates ("CDA") and the Young Men's Christian Association ("YMCA"), administered subsidies through the C2AP, C3AP, and CAPP.

4. Generally, if CDA or YMCA determined that a family was eligible to receive subsidized childcare services and the family's selected childcare provider (i) registered with CDA or YMCA, (ii) had an active license to provide care at an approved facility from the State of California Department of Social Services ("CDSS"), and (iii) submitted monthly attendance records documenting the childcare they provided, CDA and YMCA paid subsidies directly to the childcare provider, via check or direct deposit, for providing childcare to registered income-eligible families.

5. Monthly attendance record forms had "self-certification" and signature sections for both the childcare provider and the parent, both of which began, "I declare under penalty of perjury that the information provided on this attendance record is true and correct[.]" Without a completed and signed attendance record, CDA and YMCA did not issue payment to registered childcare providers.

6. CDA and YMCA used a third-party software company to transmit blank monthly attendance records forms to childcare providers. The attendance record forms included the childcare provider's name, the child's name, the parent's name, and a table for entering the child's "Time In" and "Time Out" on each day of the month.

7. Childcare providers could submit completed attendance record forms to CDA and YMCA in-person, via mail, or through a software application. All submissions resulted in a copy of the completed attendance record being transmitted, over interstate wire communications, to the third-party software company's servers in Oregon.

8. California regulations stated in part, "The licensee shall be present in the home and shall ensure that children in care are supervised at all times. When circumstances require the licensee to be temporarily absent from the home, the licensee shall arrange for a substitute adult to care for and supervise the children during his/her absence. Temporary absences shall not exceed 20 percent of the hours that the facility is providing care per day." Cal. Code Regs. Tit. 22, § 102417(a).

9. Defendant ABDULRAHMAN AYMAN ALAWAD, a resident of the Southern District of California, operated "Alawad, Abdulrahman Family Child Care" at an apartment on 47th Street in San Diego, within the Southern District of California. The license, effective May 23, 2022, authorized ALAWAD to provide care for up to eight children at the facility on 47th Street.

10. Following an application for a "location change" and "capacity change," Defendant ALAWAD received a license from CDSS to operate "Alawad, Abdulrahman Family Child Care" at an address on Reno Drive in San Diego, California, within the Southern District of California. The license, effective April 10, 2023, authorized ALAWAD to provide care for up to 14 children at the facility on Reno Drive.

**Counts 1-4**

**(Wire Fraud)**

**[18 U.S.C. § 1343]**

11. Paragraphs 1 to 10 are re-alleged and incorporated herein.

12. Beginning on a date unknown, but no later than in or about May 2022, and continuing up to and including on or about July 1, 2026, within the Southern District of California and elsewhere, defendant ABDULRAHMAN AYMAN ALAWAD, knowingly and with the intent to defraud, devised, participated in, and executed a material scheme and artifice to defraud and to obtain money and property by means of materially false and

fraudulent pretenses, representations, and promises, and intentional concealment and omission of material facts.

**Manner and Means**

13. The fraudulent scheme and artifice to defraud was operated and was carried out, and to be carried out, in substance, as follows:

14. Defendant ALAWAD applied for and received from CDSS licenses to operate childcare facilities in the Southern District of California.

15. After obtaining licenses from CDSS, defendant ALAWAD registered with CDA and YMCA as the childcare provider for families that received subsidized childcare services.

16. Defendant ALAWAD, using the third-party software, accessed and printed blank monthly attendance records for each child ALAWAD was registered with CDA or YMCA as the childcare provider.

17. Defendant ALAWAD submitted to CDA and YMCA completed attendance records for each child ALAWAD had purportedly provided childcare to in the preceding month and certified under penalty of perjury the accuracy of the dates and times he provided care to a child.

18. Defendant ALAWAD, to obtain payment from CDA and YMCA, knowingly submitted and caused to be submitted attendance records containing materially false and fraudulent statements, specifically the dates and times he purportedly provided childcare to the children identified in the attendance records, and his false certification under penalty of perjury that that the information in the attendance records was true and correct.

19. Defendant ALAWAD submitted his attendance records to CDA and YMCA, both of which processed the records through the same third-party software and thereby caused interstate wire communications, specifically

///

the transmittal of the attendance records to the third-party software company's server in Oregon.

20. CDA and YMCA relied on defendant ALAWAD's false and fraudulent statements in the attendance records and remitted payment to ALAWAD based on his materially false and fraudulent representations, promises, and intentional concealment and omission of material facts. In doing so, ALAWAD obtained funds from the United States Government that were intended to pay for childcare actually provided to low-income families.

**Use of the Wires**

21. On or about the dates set forth below, within the Southern District of California and elsewhere, defendant ABDULRAHMAN AYMAN ALAWAD, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, knowingly transmitted and caused to be transmitted by wire communications in interstate and foreign commerce, certain writings, signs, signals, and sounds as more particularly described below:

| Count | Approximate Date | Interstate Wire |
|---|---|---|
| **1** | April 2, 2026 | Electronic submission of March 2026 Attendance Record for Child 1 |
| **2** | April 2, 2026 | Electronic submission of March 2026 Attendance Record for Child 2 |
| **3** | May 4, 2026 | Electronic submission of April 2026 Attendance Record for Child 1 |
| **4** | May 4, 2026 | Electronic submission of April 2026 Attendance Record for Child 2 |

All in violation of Title 18, United States Code, Section 1343.

///

///

///

**Count 5**

**(Money Laundering)**

**[18 U.S.C. § 1957]**

22. Paragraphs 1 to 21 are re-alleged and incorporated herein.

23. On or about May 23, 2025, within the Southern District of California, defendant ABDULRAHMAN AYMAN ALAWAD did knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000.00, and which was derived from specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, to wit: the wire transfer of $335,522.61 from Bank of America account -4864 to Axos Bank account -0202 in connection with the purchase of real property at 1916 Grove Road, El Cajon, California 92020, all in violation of Title 18, United States Code, Section 1957.

**FORFEITURE ALLEGATIONS**

The allegations set forth in Counts 1 through 5 of this Complaint are realleged and incorporated as a part hereof for purposes of seeking forfeiture of property pursuant to Title 18, United States Code, Sections 981(a)(1)(A)&(C), 982(a)(1), and 982(b), and Title 28, United States Code, Section 2461(c).

Upon conviction of one and more of the offenses in violation of Title 18, United States Code, Section 1343 set forth in Counts 1 through 4 of this Complaint, defendant ABDULRAHMAN AYMAN ALAWAD shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), and Title 28, United States Code, Section 2461(c) and Title 21, United States Code, Section 853, all property, real and personal, which constitutes or is derived

from proceeds of the offenses and all property traceable to such property, and all facilitating property, including but not limited to the specific real property at 1916 Grove Road, El Cajon, California 92020.

Upon conviction of the offense in violation of Title 18, United States Code, Section 1957 as set forth in Count 5 defendant ABDULRAHMAN AYMAN ALAWAD shall forfeit to the United States all property involved in the offense pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1). The property to be forfeited includes but is not limited to real property at 1916 Grove Road, El Cajon, California 92020.

If any of the forfeitable property, as a result of any act or omission of the Defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the Defendant up to the value of the forfeitable property.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(B), and Title 28, United States Code, Section 2461(c).

///

///

///

The complainant states that this complaint is based on the attached probable cause statement, which is incorporated herein by reference.

*/s/ Joshua Adams*
JOSHUA ADAMS, Special Agent
IRS-Criminal Investigation

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 2nd day of September 2026.

HON. DAVID D. LESHNER
United States Magistrate Judge

STATEMENT OF PROBABLE CAUSE

**A. Training and Experience**

1. I am a Special Agent of the Internal Revenue Service-Criminal Investigation (IRS-CI) and have been employed since October 2023. I am currently assigned to the Los Angeles Field Office, but I work out of the San Diego, California office. I have a Bachelor of Science degree in Homeland Security and Emergency Management from National University. As part of my employment with IRS-CI, I received extensive training at the Federal Law Enforcement Training Center in Glynco, Georgia. While the training included wide-ranging instruction relating to criminal tax violations, I also received training on other federal criminal violations such as mail fraud, wire fraud, money laundering, bribery, conspiracy, and a number of other offenses which constitute specified unlawful activities under federal law.

2. All dates, times, and amounts herein are approximate.

**B. Background of Federally Subsidized Childcare Programs**

3. The United States Department of Health & Human Services provides federal funding to states to help low-income families pay for childcare expenses.

4. In California, there are four programs that provide subsidies to childcare providers servicing income-eligible families: CalWORKs Stage 1, CalWORKs Stage 2 Alternative Payment ("C2AP"), CalWORKs Stage 3 Alternative Payment ("C3AP"), and California Alternative Payment Program ("CAPP"). In San Diego, the County of San Diego administers "Stage 1" subsidies, and two community organizations, Child Development Associates ("CDA") and the Young Men's Christian Association ("YMCA"), administer subsidies through the C2AP, C3AP, and CAPP.

///

5. Generally, if CDA or YMCA determines that a family is eligible to receive subsidized childcare services and their selected childcare provider registers with CDA or YMCA, has an active license to provide care at an approved facility from the State of California Department of Social Services ("CDSS"), and submits monthly attendance records documenting the childcare they provided, CDA and YMCA pay subsidies directly to the childcare provider, via check or direct deposit, for providing childcare to registered income-eligible families.

6. The monthly attendance record forms have "self-certification" and signature sections for both the childcare provider and the parent, both of which begin "I declare under penalty of perjury that the information provided on this attendance record is true and correct[.]" Without a completed and signed attendance record, CDA and YMCA do not issue payment to registered childcare providers.

7. CDA and YMCA both use a third-party software company to transmit blank monthly attendance records forms to childcare providers. The attendance record forms include the childcare provider's name, the child's name, the parent's name, and a table for entering the child's "Time In" and "Time Out" on each day of the month. A childcare provider can submit completed attendance record forms to CDA and YMCA in-person, via mail, or through a software application; all submissions result in a copy of the completed attendance record being transmitted to the third-party software company's servers in Oregon.

8. California regulations state in part: "The licensee shall be present in the home and shall ensure that children in care are supervised at all times. When circumstances require the licensee to be temporarily absent from the home, the licensee shall arrange for a substitute adult to care for and supervise the children during his/her absence. Temporary

absences shall not exceed 20 percent of the hours that the facility is providing care per day." Cal. Code Regs. Tit. 22, § 102417(a).

**C. Investigation Background**

9. Since February 2026, IRS-CI and Homeland Security Investigations ("HSI") have been investigating a scheme in which individuals in the Southern District of California receive licenses to operate childcare facilities, register as childcare providers to families approved for subsidized childcare, and routinely submit materially false and fraudulent monthly attendance records to obtain subsidy payments. The attendance records are false and fraudulent in that they claim the individual provided care to children on dates and times that no actual childcare could have been provided, either because there were no children at the facility or the licensed provider was not at the facility--and in some instances was not even in the United States at the time of the purported childcare. CDA and YMCA rely on the accuracy of the attendance records when remitting payment to providers for the childcare they purportedly provided to low-income families.

10. Through the investigation, agents identified Defendant ABDULRAHMAN AYMAN ALAWAD as an individual who purported to provide childcare services in San Diego, California, which is in the Southern District of California, since at least 2022.

11. ALAWAD first received a license from CDSS to operate "Alawad, Abdulrahman Family Child Care" at an apartment on 47th Street in San Diego effective May 23, 2022. The license authorized ALAWAD to provide care for up to eight children at the facility on 47th Street.

12. Defendant ALAWAD submitted to CDSS applications for a "location change" and "capacity change," and received a license from CDSS to operate "Alawad, Abdulrahman Family Child Care" at an address

on Reno Drive in San Diego, California effective April 10, 2023. The license authorized ALAWAD to provide care for up to 14 children at the facility on Reno Drive.

13. On or about June 5, 2024, defendant ALAWAD signed a form submitted to CDA acknowledging in part "I understand when I sign anything under penalty of perjury I am declaring the information I have provided or statements I am making are factual, true and correct. Making false statements under penalty of perjury may result in prosecution and punishment under State and/or Federal laws."

14. Since April 2023, defendant ALAWAD has received over $700,000 in payments from San Diego County, YMCA, and CDA, including over $300,000 in 2025 alone.

15. Based on my training, experience and knowledge of this investigation, I believe ALAWAD is obtaining these funds by routinely submitting materially false and fraudulent attendance record forms that falsely claim he provided childcare to multiple children on dates when no children were at the facility and, in some instances, when ALAWAD himself was not even at the facility.

**D. ALAWAD Falsely Certified Attendance Records**

16. Based on my investigation, I believe ALAWAD falsely certified attendance records for March and April 2026.

17. On or about April 2, 2026, ALAWAD submitted 18 attendance records to CDA and 5 attendance records to YMCA, and claimed under penalty of perjury to have provided childcare to 23 children in March 2026. Combining the attendance records submitted to CDA and YMCA, ALAWAD claimed to have provided childcare every day of March 2026. Notably, ALAWAD's attendance records claimed that he cared for 11 children, including an eight-month-old baby, a two-year-old child, and two three-

year-old children, every weekend day of March 2026, with care purportedly provided from approximately 9:00 a.m. to 11:30 p.m. on weekend days. ALAWAD also claimed to have provided care to 12 children, including a two-year-old child, a three-year-old child, and both Child 1 and Child 2, every weekday of March 2026, with care purportedly provided from approximately 10:00 a.m. to 11:00 p.m.

18. On or about May 4, 2026, ALAWAD submitted 20 attendance records to CDA and 5 attendance records to YMCA, and claimed under penalty of perjury to have provided childcare to 25 children in April 2026. Combining the attendance records submitted to CDA and YMCA, ALAWAD similarly claimed in the attendance records to have provided childcare every day of April 2026. Notably, ALAWAD's attendance records claimed that he cared for at least 11 children, including a nine-month-old baby, a two-year-old child, and two three-year old children, every weekend day of April 2026--and that he cared for an additional two children, a ten-month-old baby and a three-year-old child, for over 12 hours per day for the last two weekends of April 2026--with care purportedly provided from approximately 9:00 a.m. to 11:30 p.m. on weekend days. ALAWAD also claimed to have provided care to 12 children, including Child 1 and Child 2, every weekday of April 2026, with care purportedly provided from approximately 9:00 a.m. to 11:00 p.m.

19. Each of the attendance records ALAWAD submitted for the months of March and April 2026 listed "Abdulrahman Ayman Alawad" (ALAWAD) as the provider and contained a dated signature under the "Provider Self-Certification" stating in part, "I declare under penalty of perjury that the information provided on this attendance record is true and correct[.]" The only active childcare license ALAWAD had during March

and April 2026 months was for "Alawad, Abdulrahman Family Child Care" on Reno Drive in San Diego.

20. ALAWAD submitted the attendance records for March and April 2026 to CDA and YMCA in the Southern District of California, and he caused the following interstate wires when the attendance records were transmitted to the third-party software company's server in Oregon:

| **Approximate Date** | **Interstate Wire** |
|---|---|
| April 2, 2026 | Electronic submission of March 2026 Attendance Record for Child 1 |
| April 2, 2026 | Electronic submission of March 2026 Attendance Record for Child 2 |
| May 4, 2026 | Electronic submission of April 2026 Attendance Record for Child 1 |
| May 4, 2026 | Electronic submission of April 2026 Attendance Record for Child 2 |

**E. Stationary Remote Surveillance of ALAWAD's Facility**

21. The investigation team began stationary remote surveillance of ALAWAD's licensed facility on Reno Drive on or about March 2, 2026, and ended the surveillance on or about April 27, 2026. Of the 57 days captured in the surveillance recordings, children can be seen entering or exiting ALAWAD's facility on just one day.[1]

22. Despite ALAWAD's attendance records claiming he provided childcare every day of March 2026, the surveillance recordings did not show any children entering or exiting the facility between March 2 and March 31, 2026. Notably, the recordings show ALAWAD exiting the facility

[1] The surveillance recordings do not include every minute of the 57 days; rather, the stationary remote surveillance recorded only for a duration after detecting motion in the frame, including people or moving vehicles on the sidewalk, street, or driveway adjacent to the facility.

and driving away in a vehicle at times he later claimed to provide childcare. For example:

a. Surveillance recordings show ALAWAD exiting the facility and driving away in a vehicle at approximately 1:51 p.m. on March 4, 2026, and returning at approximately 1:27 a.m. the following morning on March 5, 2026. Attendance records ALAWAD submitted claimed he provided childcare to a total of 12 children between 9:30 a.m. and 10:58 p.m. on March 4, 2026. In other words, in addition to the surveillance recordings not showing any children entering or exiting the facility on March 4, 2026, the recordings show ALAWAD was not even at the facility for over 9 hours that he purportedly provided care that day.

b. Surveillance recordings show ALAWAD exiting the facility and driving away in a vehicle at approximately 2:52 p.m. on March 10, 2026, and returning at approximately 1:06 a.m. on March 12, 2026. Attendance records ALAWAD submitted claimed he provided childcare to a total of 12 children between 10:12 a.m. and 10:56 p.m. on March 10, 2026, and to the same 12 children between 9:47 a.m. and 10:59 p.m. on March 11, 2026. In other words, in addition to the surveillance recordings not showing any children entering or exiting the facility on March 10 and March 11, 2026, the recordings show ALAWAD was not even at the facility for over 8 hours on March 10 and over 13 hours on March 11 that he purportedly provided care on those days.

c. Surveillance recordings show ALAWAD exiting the facility and driving away in a vehicle at approximately 10:39 a.m. on March 31, 2026 and returning the following morning at approximately 12:47 a.m. on April 1, 2026. Attendance records ALAWAD submitted claimed he provided childcare to 12 children between 9:25 a.m. and 11:00 p.m. In other words,

in addition to the surveillance recordings not showing any children entering or exiting the facility on March 31, 2026, the recordings show ALAWAD was not even at the facility for over 12 hours he purportedly provided care that day.

23. Similarly, despite ALAWAD's attendance records claiming he provided childcare every day of April 2026, surveillance recordings show children entering or exiting the facility on just one day between April 1 and April 27, 2026. And that one day was April 16, 2026, when a CDSS licensing program analyst conducted an unannounced visit at ALAWAD's facility.

**F. CDSS Visit to ALAWAD'S Facility**

24. During my investigation, I discovered that certain CDSS reports are available through open-source research. According to a publicly available report, a CDSS licensing program analyst conducted an unannounced visit to ALAWAD's facility on Reno Drive on April 16, 2026. The facility inspection report summarizing the unannounced visit on April 16, states in part:

a. The CDSS analyst arrived at 3:30 p.m. and was greeted by an individual identifying as ALAWAD's sister and assistant, who stated ALAWAD was picking up a child from school and who contacted ALAWAD.

b. When the CDSS analyst arrived, there were no children present.

c. The CDSS analyst spoke to ALAWAD, who stated he was picking up a child from school and would return in approximately 20 minutes.

d. At approximately 4:05 p.m., ALAWAD arrived with two children. At approximately 4:10 p.m., another assistant arrived.

///

e. The report further states, “Parents began dropping off children at approximately 4:20 PM. There were six (6) daycare children, and 2 assistants present during the inspection.”

f. The inspection was completed at 4:45 p.m.

25. The surveillance recordings from April 16, 2026, show in part:

a. No children entered the facility prior to 3:57 p.m.

b. An adult male with a rolling briefcase approached the front door at 3:32 p.m. and entered the facility at 3:35 p.m. That individual entered and exited the facility several times before exiting the facility with the rolling briefcase at 5:07 p.m. Based on my review of the CDSS facility inspection report, I believe this individual may have been the CDSS analyst.

c. One adult female and one child entered the facility at 3:57 p.m. The female exited the facility, without the child, at 3:59 p.m.

d. A car parked in the driveway at 4:05 p.m., after which one adult female and one child exited the car and entered the facility at 4:06 p.m.

e. At 4:07 p.m., a different car parked in front of the facility, and ALAWAD exited that car and entered the facility. Based on my review of the CDSS facility inspection report, I believe the CDSS analyst erred in writing that ALAWAD “arrived at the facility at approximately 4:05 PM with 2 children,” as the surveillance recordings show the two children entered the facility before ALAWAD arrived, without any children, at 4:07 p.m.

f. At 4:14 p.m., a child or small adult entered the facility.

g. At 4:19 p.m., an adult female and a child entered the facility.

h. At 4:20 p.m., an adult male retrieved two children and left the facility.

i. At 4:24 p.m., a third car approached the facility, and two adults and two children exited the car and entered the facility. At 4:25 p.m., the two adults exited the facility and departed in the car.

j. At 6:25 p.m., ALAWAD, one adult woman, and two children exited the facility and departed in a car.

26. In the attendance records ALAWAD submitted to CDA for April 16, 2026--the day of the inspection--ALAWAD claimed to have provided care to seven children on April 16, 2026, specifically: A.Y.M. and I.Y. from 2:31 p.m. to 9:55 p.m.; L.M. from 3:15 p.m. to 10:52 p.m.; A.A. and S.A. from 3:17 p.m. to 10:49 p.m.; Child 1 and Child 2 from 3:45 p.m. to 9:51 p.m.

27. In the attendance records ALAWAD submitted to YMCA, ALAWAD claimed to have provided care to five additional children on April 16, 2026, specifically: three children from 2:44 p.m. to 10:58 p.m., and two additional children from 9:00 a.m. to 8:12 p.m.

28. As mentioned above, according to the CDSS report, when the CDSS analyst arrived at approximately 3:30 p.m., there were no children present. Moreover, surveillance video shows ALAWAD departing the location at approximately 6:25 p.m. Based on my training and experience and knowledge of this investigation, I believe ALAWAD falsely submitted attendance records claiming he provided childcare to children that were not actually present the facility and at times that not even ALAWAD was at the facility.

**G. Payments to ALAWAD**

29. After submitting the attendance records for childcare provided in March 2026, Defendant ALAWAD received three checks from CDA and YMCA

that totaled $26,125.73 and which were mobile deposited into a bank account on April 20, 2026. Account records show ALAWAD is the sole signer on the account. Those same records show withdrawals in the amount of $4,500 and $19,000 on the following day, April 21, 2026.

30. After submitting the attendance records for childcare provided in April 2026, Defendant ALAWAD received three checks from CDA and YMCA that totaled $23,087.07.

**H. ALAWAD'S International Travel**

31. Border crossing records show ALAWAD departed the United States on or about April 20, 2023, and returned to the United States on or about May 11, 2023. Despite not being in the United States, ALAWAD submitted at least two attendance records to YMCA claiming to have provided care to children (for over seven hours per day) on eight days between May 1 and May 10, 2023.

32. Border crossing records also show ALAWAD departed the United States on or about June 15, 2024, and returned to the United States on or about July 3, 2024. Despite not being in the United States, ALAWAD submitted at least three attendance records to YMCA claiming to have provided care to children (for over seven hours per day), including a four-month old baby, on 10 days between June 16 and June 30, 2024.

33. Based on my training and experience and knowledge of this investigation, I believe these were materially false and fraudulent attendance records that were fabricated to obtain payment for childcare that ALAWAD did not actually provide.

**I. ALAWAD Purchased a House**

34. From at least August 2023 to April 2026, ALAWAD deposited checks received from CDA and YMCA into a Bank of America account -4864 that he opened on June 26, 2023. In May 2025, ALAWAD and his mother

purchased a house located at 1916 Grove Road, El Cajon, California 92020. The sale price was $1,000,000. Prior to closing, ALAWAD wired from Bank of America account -4864 to Axos Bank account -0202 the following: $10,000 on April 17, 2025; $5,000 on May 19, 2025; and $335,522.61 on May 23, 2025, with the beneficiary identified as Executive Escrow Services.

35. Based on my review of ALAWAD's Bank of America account -4864, I did not observe any significant income besides the money from CDA and YMCA, which as described above, are from the fraudulent scheme.

**J. Conclusion**

36. Based on my training and experience, I believe ALAWAD executed a wire fraud scheme from a date unknown but no later than April 2023 and continuing through at least July 1, 2026, in violation of 18 U.S.C. § 1343 and knowingly engaged in a monetary transaction with criminally derived property of a value greater than $10,000.00 when he transferred $335,522.61 to an escrow company in connection with the purchase of real property at 1916 Grove Road, El Cajon, California 92020 on May 23, 2025. I believe that based upon the foregoing the real property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1).